# EXHIBIT A

Westlaw.

S. REP. 90-1097                                                                  Page 1
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

*2112 P.L. 90-351, OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968
Senate Report (Judiciary Committee) No. 90-1097,
Apr. 29, 1968 (To accompany S. 917)
House Report (Judiciary Committee) No. 90-488,
July 17, 1967 (To accompany H.R. 5037)
Cong. Record Vol. 113 (1967)
Cong. Record Vol. 114 (1968)
DATES OF CONSIDERATION AND PASSAGE
Senate May 24, 1968
House Aug. 8, 1967; June 6, 1968
The House bill was passed in lieu of the Senate bill after substituting for its language the text of the Senate bill.
The Senate Report is set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 90-1097
Apr. 29, 1968

THE Committee on the Judiciary, to which was referred the bill (S. 917) to assist State and local governments in reducing the incidence of crime to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes having considered the same, reports favorably thereon, with an amendment in the nature of a substitute, and recommends that the bill, as amended, do pass.

*2113 PURPOSE OF AMENDMENT

The bill, as amended, is divided into five title: Title I, Law Enforcement Assistance; Title II, Admissibility of Confessions, Reviewability of Admission in Evidence of Confessions in State Cases, Admissibility in Evidence of Eyewitness Testimony, and Procedures in Obtaining Writs of Habeas Corpus; Title III, Wiretapping and Electronic Surveillance; Title IV, State Firearms Control Assistance; and Title V, General Provisions.

Title I, Law Enforcement Assistance, authorizes the establishment of a three-member Law Enforcement Assistance Administration within the Department of Justice under the general authority of the Attorney General to administer grant programs to States and units of local government to strengthen and improve law enforcement. These programs will consist of planning grants of up to 80 percent and action grants of up to 60 percent, with grants of up to 80 percent and action grants of up to 60 percent, and control riots and other civil disorders. In addition, grants of up to 100 percent are authorized for research, education, training, and demonstration projects. The Federal Bureau of Investigation National Academy at Quantico, Va., and, at the request of any State or local government,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

S. REP. 90-1097                                                                 Page 63
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

   Subparagraph (i) prohibits any interception through the use of a device linked in any way to the interstate or foreign network of wire communications. Under this provision, for example, the use of leased or other telephone lines to transmit signals intercepted by eavesdropping devices is prohibited. The use of such lines in the past has greatly extended the range of eavesdropping devices, since the devices can be made useful in circumstances **\*2181** where intercepted conversations cannot be conveniently monitored from adjacent premises, but must be transmitted to a more distant location.
   Subparagraph (ii) prohibits any interception through the use of a device which transmits communications by radio or which interferes with the transmission of radio communications. As in the case of wire communications, by radio or which interferes with the transmission of radio communications. As in the case of wire communications, Congress has plenary power under the commerce clause to regulate not only the use of radio devices, but also the use of devices that interfere with radio communications. Subparagraph (ii) is intended to be a complete prohibition against the use of such devices for the interception of oral communications. The provisions will be applicable even though only one component in a series of devices used in combination by an eavesdropper is a radio device.
   Subparagraph (iii) prohibits any interception through the use of a device, if the device itself or any of its components has been sent through the mail or transmitted in interstate or foreign commerce.
   Subparagraph (iv) prohibits any interception that takes place on the premises of a business whose operations affect interstate or foreign commerce. The subparagraph also prohibits any interception, wherever it takes place, which obtains or is for the purpose of obtaining information about such a business. The broad provisions of the subparagraph are intended to eliminate one of the most insidious contemporary practices of industrial espionage.
   Subparagraph (v) prohibits any interception that takes place in the District of Columbia, Puerto Rico, or the territories or possessions of the United States. Since Congress has plenary power over these geographic areas, the prohibitions are complete.
   Taken together, subparagraphs (i) to (v) of subparagraph (b) create an essentially comprehensive ban on the interception of oral communications. The provisions will be applicable to the overwhelming majority of cases involving the unlawful interception of such communications, and it will be unnecessary to rely on the broader prohibition of subparagraph (a). In many cases, use of a particular device will violate more than one, or even all, of the provisions of subparagraph (b). The committee intends in such cases that a person may be convicted of only one offense under the section.
   ==Subparagraphs (c) and (d) prohibit, in turn, the disclosure or the use of the contents of any intercepted communication by any person knowing or having reason to know the information was obtained through an interception in violation of this subsection. The disclosure of the contents of an intercepted communication that had already become public information' or 'common knowledge ' would not be prohibited. The scope of this knowledge required to violate either subparagraph reflects existing law (Pereira v. United States, 74 S.Ct. 358, 347 U.S. 1 (1954)). A violation of each must be willful to be criminal (United States v. Murdock, 54 S.Ct. 223, 290 U.S. 389 (1933)). Each prohibition strikes not only at the prohibited action but also at endeavors (Osborn v. United States, 87 S.Ct.==

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

S. REP. 90-1097                                                          Page 64
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

429, 385 U.S. 323 (1966)) and procurements (Nye & Nissen v. United States, 69 S.Ct. 766, 336 U.S. 613 (1949)). There is no intent to preempt State law. *2182 Each violation is punishable by a fine of $10,000 or imprisonment of not more than 5 years, or both.

  Paragraph (2)(a) provides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, disclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of the rights or property of the carrier.  It is intended to reflect existing law (United States v. Beckley, 259 F.Supp. 567 (D.C. Ga. 1965)).  Paragraph (2)(a) further provides that communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.  Service observing is the principal quality control procedure used by these carriers for maintaining and improving the quality of telephone service.  Such observing is done by employees known as service observers, and this provision was inserted to insure that service observing will not be used for any purpose other than mechanical and service quality control.

  Paragraph (2)(b) provides a similar exception for an employee of the Federal Communications Commission in the normal course of his employment in the discharge of the monitoring responsibility of the Commission.

  Paragraph (2)(c) provides that it shall not be unlawful for a party to any wire or oral communication or a persons given prior authority by a party to a communication to intercept such communication.  It largely reflects existing law.  Where one of the parties consents, it is not unlawful.  (Lopez v. United States, 83 S.Ct. 1381, 373 U.S. 427 (1963); Rathbun v. United States, 78 S.Ct. 161, 355 U.S. 107 (1957); On Lee v. United States, 72 S.Ct. 967, 343 U.S. 747 (1952)).  Consent may be expressed or implied.  Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to.  Retroactive authorization, however, would not be possible.  (Weiss v. United States, 60 S.Ct. 269, 308 U.S. 321 (1939)) and 'party' would mean the person actually participating in the communication.  (United States v. Pasha, 332 F. 193 (7th), certiorari denied, 85 S.Ct. 75, 379 U.S. 839 (1964)).

  Paragraph (3) is intended to reflect a distinction between the administration of domestic criminal legislation not constituting a danger to the structure or existence of the Government and the conduct of foreign affairs.  It makes it clear that nothing in the proposed chapter or other act amended by the proposed legislation is intended to limit the power of the President from the acts of a foreign power including actual or potential attack or foreign intelligence activities, or any other danger to the structure or existence of the Government.  Where foreign affairs and internal security are involved, the proposed system of court ordered electronic surveillance envisioned for the administration of domestic criminal legislation is not intended necessarily to be applicable.  The two areas may, however, overlap. Even though their activities take place within the United States, the domestic Communist party and its front groups remain instruments of the foreign policy of a foreign power (Communist Party, U.S.A. v. Subversive Activities Control Board, 81 S.Ct. 1357, 367 U.S. 1 (1961)).  *2183 Consequently, they fall within the field of foreign affairs and outside the scope of the proposed chapter. Yet, their activities may involve violations of domestic criminal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 4:12-cv-04022-SOH   Document 24-1   Filed 05/03/12   Page 5 of 6 PageID #: 289

Westlaw.

S. REP. 90-1097                                                        Page 65
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

legislation.  See Abel v. United States, 80 S.Ct. 683, 362 U.S. 217 (1960).  These provisions of the proposed chapter regarding national and internal security thus provide that the contents of any wire or oral communication intercepted by the authority of the President may be received into evidence in any judicial trial or administrative hearing. Otherwise, individuals seeking the overthrow of the Government, including agents of foreign powers and those who cooperate with them, could not be held legally accountable when evidence of their unlawful activity was uncovered incident to the exercise of this power by the President.  The only limitations recognized on this use is that the interceptions be deemed reasonable based on an ad hoc judgment taking into consideration all of the facts and circumstances of the individual case, which is but the test of the Constitution itself (Carroll v. United States, 45 S.Ct. 280, 267 U.S. 132 (1925)).  The possibility that a judicial authorization for the interception could or could not have been obtained under the proposed chapter would be only one factor in such a judgement.  No preference should be given to either alternative, since this would tend to limit the very power that this provision recognizes is not to be deemed disturbed.

The provisions of section 2512 banning the manufacture, distribution, sale, possession, and advertising of wiretapping and eavesdropping devices will significantly curtail the supply of a variety of devices.  There is no intent to preempt State law.  The prohibitions are applicable to devices whose design renders them primarily useful for the surreptitious interception of private wire or oral communications.  The statutory phrase is intended to establish a relatively narrow category of devices whose principal use is likely to be for wiretapping or eavesdropping.  A device will not escape the prohibition merely because it may have innocent uses.  The crucial test is whether the design of the device renders it primarily useful for surreptitious listening.  Obviously, the sort of judgment called for here in close cases would warrant the use of expert testimony.

See United States v. One Device, 160 F. 194 (10th 1947).  The prohibition will thus be applicable to, among others, such objectionable devices as the martini olive transmitter, the spike mike, the infinity transmitter, and the microphone disguised as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler, or cigarette pack.  Such devices are widely advertised and distributed at the present time and are readily available on the market.  By banning these devices, a significant source of equipment highly useful for illegal electronic surveillance will be eliminated.

At the same time, the prohibitions of section 2512 will cause no substantial interference with the production, distribution, or use of legitimate electronics equipment, whether by the electronics industry or others.  Size alone is not the criterion under the section.  A device does not fall under the prohibitions merely because it is small, or because it may be adapted to wiretapping or eavesdropping.  Nor will the prohibition be applicable, for example, to devices such as the parabolic microphone or other directional microphones ordinarily used by broadcasters at sports events.  Such devices cannot be said to be primarily useful for surreptitious listening.  To be prohibited *2184 the device would also have to possess attributes that give predominance to the surreptitious character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter and the other devices mentioned in the preceding paragraph.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

S. REP. 90-1097                                                         Page 71
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968,
1968 U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

engaged in intercepting wire or oral communications in the manner authorized in the chapter, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section, discussed above. Such contents and any evidence derived therefrom may be introduced in evidence under subsection (3) of this section only when authorized or approved by a judge of competent jurisdiction as defined in section 2510(9) where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. They need not be designated 'offenses.' Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order. Compare, Marron v. United States, 48 S.Ct. 74, 275 U.S. 192, 196 (1927), with United States v. Eisner, 297 Fed. 595 (6th 1962), and State v. Hunter, 235 Wis. 188, 292 N.W. 609 (1940).
  Section 2518 of the new chapter sets out in detail the procedure to be followed in the interception of wire or oral communications.
  Paragraph (1) requires a written application for an authorization to intercept wire or oral communications. This reflects existing law. See Fed.R.Crim.Proc. 41. The information each application should contain is specified in subparagraphs (a) through (c).
  Subparagraph (a) requires the identity of the person who makes, and the person who authorized the application to be set out. This fixes responsibility.
  Subparagraph (b) requires that a full and complete statement of the facts and circumstances relied upon by the applicant be set out, including (i) the details as to what type of offense has been, is being, or is about *2190 to be committed, (ii) the place where, or the facilities or phone from which the communication is to be intercepted, (iii) a particular description of the type of the communication which it is expected will be intercepted, and (iv) the identity of the person, if known, who is committing the offense and whose communications are to be intercepted. Each of these requirements reflects the constitutional command of particularization (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, 58-60 (1967); Katz v. United States, 88 S.Ct. 507, 389 U.S. 347, 354-56 (1967)).
  Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. This requirement is patterned after traditional search warrant practice abd present English procedure in the issuance of warrants to wiretap by the Home Secretary. Compare Report of the Committee of Councillors Appointed to Inquire into the Interception of Communication, par. 64 (1957); Read v. Case, 4 Conn. 166 (1822). The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. See Giancana v. United States, 352 F.2d 921 (7th) certiorari denied, 86 S.Ct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.